FILED
09/13/2022
Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs June 1, 2022

## ELIZABETH ANN BAKER GRACE v. JONATHAN GARRETT GRACE

**Appeal from the Chancery Court for Montgomery County**
**No. MC-CH-CV-FD-17-1          Ted A. Crozier, Judge**
_____

### No. M2021-00116-COA-R3-CV
_____

This appeal arises from a post-divorce petition to modify a parenting plan, specifically the parenting schedule, and a counter-petition to modify child support. The parties were divorced in Kentucky shortly after the father was diagnosed with a mental illness in 2012. The separation agreement gave the father visitation "as agreed upon by the parties to be supervised at all times by [the father]'s parents." Over the next four years, the father enjoyed frequent and liberal visitation with the child. This arrangement continued until the grandparents took the father to the child's school performance. The mother believed the father's presence was "wildly inappropriate" due to his mental health issues. She subsequently refused the grandparents' requests to see the child, effectively depriving the father of any parenting time with the child. The father then commenced this action by petitioning to modify the parenting plan so that he would have regularly scheduled parenting time that was not subject to the mother's unilateral approval. The mother opposed the father's petition and filed a counter-petition to modify his child support obligation and to award an arrearage judgment for unpaid child support. After a trial, the court found that the mother's unilateral termination of the father's visitation was a material change in circumstance and that scheduled, supervised visitation with the father was in the child's best interest. The trial court also retroactively modified the father's child support obligation and awarded an arrearage judgment of $7,000 in favor of the mother for unpaid child support. The court denied the mother's request for pre- and postjudgment interest because the mother's "own actions . . . caused a lengthy delay to the conclusion of the[] proceedings." The mother raises several issues on appeal. She contends the trial court lacked subject matter jurisdiction because there was no evidence that the mother, the child, and the father lived in Tennessee for six months before the father's petition. She also contends that her refusal to allow the grandparents to see the child was not a material change in circumstance. Further, she contends the trial court erred in its calculation of the father's child support obligation and in failing to award pre- and post-judgment interest under Kentucky law. After carefully reviewing the record, we agree with the trial court in all regards except its denial of interest and the effective date of the modified support order.

Therefore, the judgment of the trial is affirmed in part, reversed in part, modified in part, and remanded for further proceedings consistent with this opinion.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed in part, Reversed in part, Modified in part, and Remanded.**

FRANK G. CLEMENT JR., P.J., M.S., delivered the opinion of the Court, in which KRISTI M. DAVIS and CARMA DENNIS MCGEE, JJ., joined.

Melissa Ann Baker, Brentwood, Tennessee, for the appellant, Elizabeth Ann Baker Grace.

Michael Kenneth Williamson, Clarksville, Tennessee, for the appellee, Jonathan Garrett Grace.

## OPINION

### FACTS AND PROCEDURAL HISTORY

#### I. BACKGROUND

In October 2010, Elizabeth Ann Baker Grace ("Mother") married Jonathan Garrett Grace ("Father"), after which the couple moved into a farmhouse in Christian County, Kentucky. Around the same time, Father began experiencing auditory hallucinations and attempted to commit suicide. The couple's only child, River ("the Child"), was born in July 2011.

Soon after the Child was born, Father enlisted in the United States Marine Corps. But two days into boot camp, Father attempted to commit suicide a second time. Father was then discharged from the military and hospitalized at Vanderbilt Psychiatric Hospital in Nashville, Tennessee, where his condition was diagnosed as schizoaffective disorder and obsessive-compulsive disorder ("OCD").

Unsettled by Father's behavior, Mother moved out of the couple's house and filed a petition for divorce in the Christian County Family Court. The parties then executed a separation agreement that gave Mother full custody of the Child and gave Father visitation "as agreed upon by the parties to be supervised at all times by [Father]'s parents." In October 2012, the court granted Mother's petition and approved the separation agreement;

however, due to the severity of Father's mental illness, he was not ordered to pay child support "at the present time."[1]

One year later, Father was approved for Social Security Disability Insurance ("SSDI"), and Mother began receiving $164 per month on behalf of the Child. Around the same time, the Christian County court ordered Father to pay $206.50 per month in child support. Assuming that he was entitled to a credit for the Child's SSDI payments, Father started sending Mother $60 per month to cover the balance.

Despite her antipathy to Father, Mother maintained a good relationship with the Child's paternal grandparents, Karen Grace ("Grandmother") and Tony Grace ("Grandfather") (collectively, "Grandparents"). Grandparents lived in Clarksville, Tennessee, and Mother allowed the Child to stay with them from time to time. Mother knew that the Child sometimes saw Father there, but she did not know the frequency or nature of Father's visits. Father never arranged for visitation directly with Mother, and Grandparents avoided talking about Father around Mother because it upset her.

The frequency of the Child's visits increased in January 2014 when Mother married a soldier stationed at Fort Campbell, Joel Stephen Diemoz ("Stepfather"), at which time they moved to Hopkinsville, Kentucky—a nearby town across the Tennessee-Kentucky border from Clarksville. A year later, Mother moved even closer to Grandparents when she and Mr. Diemoz bought a house in Clarksville. Meanwhile, Father continued to comply with his treatment and eventually saw a remission of his auditory hallucinations.

Relations between Grandparents and Mother remained favorable until December 2016, when Grandparents took Father to a kindergarten program at the Child's school. Mother—who had not spent time around Father for nearly four years—told Grandmother that Father's presence at the elementary school was "wildly inappropriate" because of his mental illness. Immediately thereafter, Mother ceased all contact between the Child and Grandparents. As a consequence of Mother's unilateral decision, Father's parenting time with the Child also ended.

---

[1] The Separation Agreement included a Child Support provision that afforded Mother the right to apply for child support in the future:

> 5. Child Support. Since [Father] currently is unemployed and is undergoing treatment at Vanderbilt, he shall have no child support obligation to [Mother] for [the Child] at the present time. The parties acknowledge that [Mother] may seek child support from [Father] at a later date in accordance with KRS 403.210 and 403.211.

In January 2017, one month after Mother cut off contact with Grandparents, Father filed a petition to register the Kentucky divorce decree in Montgomery County, Tennessee. The divorce decree was registered in Tennessee pursuant to an agreed order entered in June 2017.

The next month, Father petitioned to modify the Child's residential schedule and asked for supervised visitation every other weekend. But the petition was suspended a short time later after Mother and Stepfather filed their Petition for Termination of Parental Rights and Stepparent Adoption.[2] The petition alleged that Father was incompetent to provide care and supervision for the Child and that he had abandoned the Child by not visiting or providing financial support.

## II. TERMINATION PROCEEDINGS

At the final hearing on Mother and Stepfather's petition to terminate Father's parental rights, the trial court heard live testimony from several witnesses, including Father, Mother, and Father's psychologist, Dr. Deborah Tyson. The court also received into evidence the deposition testimony of Father's psychiatrist, Dr. Tareko Amison; Father's psychiatric nurse practitioner, Helen Hatfield; and a court-appointed forensic psychiatrist, Dr. Michael McGhee.

Dr. McGhee testified that Father's comorbid conditions put him at a "higher risk" for acting on his intrusive thoughts "under the right circumstances." For this reason, Dr. McGhee concluded that the Child "would be at risk in the company of [Father]." However, his opinion differed with that of the other expert witnesses. For example, Dr. Tyson, Dr. Amison, and Ms. Hatfield testified that Father had complied with his treatment, had not been hospitalized since 2016, and was not a threat to himself or anyone else. Dr. Amison acknowledged that Father was still working to control his OCD symptoms, but she stated that Father no longer experienced auditory hallucinations, the main symptom of his schizoaffective disorder. Ms. Hatfield—a specialist in OCD—explained that Father's "obsession" was thinking that he did something wrong, and his "compulsion" was seeking reassurance from others that he did not. Ms. Hatfield clarified that Father "has no desire or . . . urge to do anything wrong"; to the contrary, Father's anxiety stemmed from his desire "to do everything right."

Taking it a step further, as summarized by the trial court, Dr. Tyson testified that she was staking her professional reputation on her opinion that to a reasonable medical certainty Father was not a threat to himself or anyone else:

---

[2] Mother and her husband filed the petition as "Elizabeth Penelope Diemoz and husband, Joel Stephen Diemoz." The petition and subsequent notice of appeal identified Father's address as "260 Avignon Way, Clarksville, TN 37042."

39. Dr. Tyson indicates that [Father] has been compliant with his treatment and his medication and that [Father's] diagnoses are not detrimental to the child and do not prevent harm from providing a safe and stable home for his child. Dr. Tyson further indicates that she has reviewed Father's medical records in their entirety.

40. Dr. Tyson witnessed the Mother's entire case in chief, including the examination under oath of the Father. She had reviewed the report of Dr. McGhee, dated August 27, 2018, as well as . . . the deposition of Dr. McGhee conducted on March 15, 2019. Dr. Tyson reviewed the deposition of the Father's Psychiatrist, Dr. Amison, as well as the father's Obsessive-Compulsive Disorder (OCD) therapist, Ms. Hatfield.

41. Dr. Tyson was familiar with the Father's diagnosis of Schizoaffective disorder, depressive type and Obsessive-Compulsive Disorder (OCD). She explained that the Father has "disturbing thoughts against what his moral thoughts are."

42. Dr. Tyson testified that the Father's condition is characterized by depressed mood, distractibility, inattention and getting lost in conversation.

43. Dr. Tyson's observations date back to June 2016. She never had reason to believe that the Father was not compliant with his drug regimen or the instructions of his other care givers.

44. Dr. Tyson believes the Father is doing well, driving to appointments and attending school.

45. Dr. Tyson believes that the Father has an ideal support situation, residing with his parents in a structured environment.

46. Dr. Tyson finds it is significant that there has been no suicide threat or attempt since 2014 and that the Father has not been hospitalized since 2016.

47. Dr. Tyson testified that each time she sees a patient, including the Father, she assesses whether that patient is a threat to themselves or others. Dr. Tyson candidly testified that she was staking her professional reputation on her opinion that to a reasonable medical certainty the Father was not a threat to himself or anyone else.

The trial court found the testimony of Dr. Tyson very relevant and persuasive due in part to the fact that she had been licensed since 1995 as a clinical psychologist specializing in psychotic disorders and had been treating Father once or twice a month since June 7, 2016.

Based on these and other facts, the trial court found that Mother failed to prove that Father was incompetent to provide care and supervision for the Child.

The trial court also found that Mother failed to prove that Father abandoned the Child. The court acknowledged that "[i]deally the Father would have been more aggressive in asserting his rights," but it found the way visitation occurred was immaterial given that Father "had substantial visitation" for more than four years. The court found Father's failure to visit after December 2016 was not willful because Mother "unilaterally cut off" Father's contact with the Child. And while Father had not been paying his entire child support obligation, the trial court found that Father reasonably believed he was entitled to a credit for the SSDI payments.

Additionally, the trial court found that Mother failed to prove that termination of Father's rights was in the Child's best interest. The court recognized that Father had mental health issues, but it noted that Father was "being treated effectively by multiple mental healthcare professionals and is compliant to both treatment and medication." Accordingly, the court found that Father had "made satisfactory arrangements and adjustments to provide for the safety of the minor child, utilizing the support of his parents and family." The court also found that Father and the Child had a meaningful relationship, citing evidence that Father and the Child "spend their time together reading books, playing ball, working on homework and various other parent/child activities."

Based on these and other findings, the trial court denied the petition to terminate Father's parental rights.[3]

## III. MODIFICATION PROCEEDINGS

Following the dismissal of the termination proceeding, the trial court set a final hearing on Father's petition to modify the Child's residential schedule for December 1, 2020. But on the day before the trial was to begin, Mother asked the court for a continuance so that she could finish responding to Father's discovery requests. The trial court granted Mother's motion and continued the trial to December 22, 2020.

Then, on December 18, 2020—four days before the scheduled trial—Mother answered Father's petition and filed a counter-petition to modify Father's child support obligation. Mother maintained that regular visitation with Father was not in the Child's best interest due to Father's mental health issues, and she asked the trial court to modify Father's child support obligation retroactively to the date of Father's petition in January

---

[3] The trial court entered its final order on February 20, 2020. Three months later, Mother filed an appeal, which this court dismissed as untimely pursuant to an order entered on April 8, 2020. *See In re River G.*, No. M2020-00747-COA-R3-PT (Tenn. Ct. App. Apr. 8, 2020).

- 6 -

2017. Mother also asked for an award of unpaid support with pre- and postjudgment interest.

Notwithstanding the late filings, the case proceeded to trial on December 22, 2020, as scheduled, at which time the court heard testimony from six witnesses and entered fifteen exhibits into evidence.[4] At the conclusion of the hearing, the court took the matter under advisement.

In its January 29, 2021 order, the court granted Father's petition to modify the residential schedule and Mother's petition to modify child support. As for Father's petition, the court found that "Mother's termination of visitation between the parties' minor child and the Father and his family constitute[d] a material change in circumstance warranting modification" of the residential schedule. The court also found that modification of the residential schedule was in the Child's best interest. The court reasoned that Mother "made every effort to thwart and discourage a close and continuing parent-child relationship between the minor child and the Father," and it observed that Mother was using the modification proceedings "to effectively 'take a second bite at the apple' by denying [Father] even standard parenting time." Based on these and other findings, the court adopted Father's proposed parenting plan.

As for Mother's counter-petition, the court found that Father owed $5,274 under the Kentucky support order for the months of January 2014 to December 2016. The court then modified Father's support obligation to $116 per month, retroactive to January 2017, based on an income of $1,692.80 per month for Father and $4,333.33 per month for Mother. The court found that Father owed $2,454 under the new support for the months of January 2017 to January 2021.

Based on the above, the court awarded Mother a judgment against Father for $7,672 to be paid in $100 monthly installments until satisfied. But the court denied Mother's request for pre- and postjudgment interest, explaining that Mother's "own actions . . . caused a lengthy delay to the conclusion of the[] proceedings."

This appeal followed.

## ISSUES

(1) Whether the trial court lacked subject matter jurisdiction, in accordance with the Uniform Child Custody Jurisdiction Enforcement Act ("UCCJEA"), to modify the time-sharing arrangement determined by the

---

[4] At the final hearing, the parties also announced their agreement that the trial court could incorporate the relevant portion of its findings from the termination case into its findings in this proceeding.

Kentucky divorce court to be appropriate at the time of the parties' divorce.

(2) Whether Father proved by a preponderance of the evidence that a material change in the parties' circumstances arose from Father's attendance at the Child's December 15, 2016 Kentucky school function, such that modification of the time-sharing arrangement set forth in the parties' Kentucky divorce decree was warranted.

(3) Whether the court erred when it calculated child support in violation of the child support guidelines by imputing income to Mother when there was no evidence of income, the evidence showed she had two small children, and the circuit court did not impute income to Father when he testified that he quit three different jobs voluntarily.

(4) Whether the circuit court erred when it calculated child support arrears for 2017, 2018, 2019, and 2020 and failed to provide for prejudgment interest and postjudgment interest under the parties' dissolution agreement and Kentucky law.

(5) Whether Mother is entitled to an award of appellate attorney's fees under both Tennessee Code Annotated § 36-5-103(c) and the attorney's fee enforcement provision in the parties' Kentucky divorce decree.

**ANALYSIS**

I. SUBJECT MATTER JURISDICTION

A. Jurisdiction to Modify the Residential Schedule

Mother contends that the trial court lacked subject matter jurisdiction to modify the Child's residential schedule because there was no evidence that Mother, Father, or the Child resided in Tennessee during the six months before Father filed his petition in July 2017.

Whether a court has subject matter jurisdiction over a case is a question of law, which we review de novo with no presumption of correctness. *Word v. Metro Air Servs., Inc.*, 377 S.W.3d 671, 674 (Tenn. 2012).

Under Tennessee Code Annotated § 36-6-218, Tennessee courts may modify another state's custody decision if (1) Tennessee courts would have "jurisdiction to make an initial custody determination" and (2) "the child [and] the child's parents . . . do not

presently reside in the other state."[5] Our courts have jurisdiction to make an initial custody determination if Tennessee "is the home state of the child on the date of the commencement of the proceeding." *Id.* § 216(a)(1). The child's "home state" is "the state in which a child lived with a parent . . . for at least six (6) consecutive months immediately before the commencement of a child custody proceeding." *Id.* § 205(7).

Father filed his petition to modify the residential parenting schedule in July 2017. In her November 2017 deposition, Mother testified that she and the Child moved to Clarksville, Tennessee, in mid-2015 and still lived there. It is undisputed that Father moved to Tennessee in 2012 and has lived here ever since. Thus, Tennessee courts had "jurisdiction to make an initial determination" because Tennessee was the Child's "home state," and neither the parties nor the Child lived in Kentucky at the time that Father filed his petition.

Based on the above, we conclude that the trial court had subject matter jurisdiction over Father's petition to modify the parenting plan.

## B. Jurisdiction to Modify Child Support

Although not raised by either party, we find it necessary to address one other issue related to the modification of Father's child support obligation: whether the trial court erred by making Father's new child support obligation effective as of January 2017.[6]

"Tennessee's courts derive subject matter jurisdiction from the state constitution or from legislative acts." *Osborn v. Marr*, 127 S.W.3d 737, 739 (Tenn. 2004). Tennessee Code Annotated § 36-5-101 delimits the boundaries of a court's authority to award and modify child support. *See Woodard v. Woodard*, No. E2017-00200-COA-R3-CV, 2018 WL 3339754, at *2 (Tenn. Ct. App. July 9, 2018). In 1987, the Tennessee General

---

[5] "Because jurisdiction attaches at the commencement of a proceeding, the relevant inquiry is where did the parties reside at the time of the filing of the modification petition." *Stack v. Stack*, No. M2014-02439-COA-R3-CV, 2016 WL 4186839, at *5 (Tenn. Ct. App. Aug. 4, 2016) (citing *Staats v. McKinnon*, 206 S.W.3d 532, 548–49 (Tenn. Ct. App. 2006); *Highfill v. Moody*, No. W2009-01715-COA-R3-CV, 2010 WL 2075698, at *11 (Tenn. Ct. App. May 25, 2010)).

[6] "This Court is required to consider the subject matter jurisdiction of both this Court and the trial court regardless of whether the existence thereof is presented as an issue." *Morrow v. Bobbitt*, 943 S.W.2d 384, 392 (Tenn. Ct. App. 1996) (citing Tenn. R. App. P. 13(b); *Wunderlich v. Fortas*, 776 S.W.2d 953, 957 (Tenn. App. 1989)). Additionally, Tennessee Rule of Appellate Procedure 13(b) provides, "The appellate court . . . may in its discretion consider other issues in or, among other reasons: (1) to prevent needless litigation, (2) to prevent injury to the interests of the public, and (3) to prevent prejudice to the judicial process."

Assembly amended § 36-5-101 to provide that child support judgments "shall not be subject to modification as to any time period or any amounts due **prior to the date that an action for modification is filed** and notice of the action has been mailed to the last known address of the opposing parties." *Rutledge v. Barrett*, 802 S.W.2d 604, 606 (Tenn. 1991) (emphasis added) (quoting Tenn. Code Ann. § 36-5-101(f)(1)(A)); *see also* Tenn. Comp. R. & Regs. 1240-02-04-.05(8) ("No ordered child support is subject to modification as to any time period or any amounts due prior to the date that an action for modification is filed and notice of the action has been mailed to the last known address of the opposing parties."). Our courts have construed this statute as prohibiting the modification of amounts due prior to the date that a cross-petition for modification was filed. *See, e.g.*, *Rutledge*, 802 S.W.2d at 606 (holding that the trial court "could not reduce amounts that accrued prior to the filing of the father's 1988 cross-petition").

Because Mother filed her petition to modify Father's child support obligation on December 18, 2020, the modification of Father's existing child support obligation could not take effect prior to that date.[7] For this reason, the trial court erred when it made Father's new child support obligation effective in January 2017—the month that he filed his petition to register the divorce decree. Accordingly, we modify the judgment of the trial court to make Father's child support obligation effective December 18, 2020.

Because we have modified the effective date for Father's new child support obligation, the trial court must recalculate Father's arrearage on remand.

## II. MODIFICATION OF RESIDENTIAL SCHEDULE

Mother contends that the trial court erred when it found that she "terminated" Father's visitation and that the "termination" constituted a material change in circumstance.[8]

"Whether a material change in circumstances has occurred and whether a modification of a parenting plan serves a child's best interest are factual questions." *Armbrister v. Armbrister*, 414 S.W.3d 685, 692–93 (Tenn. 2013) (citing *In re T.C.D.*, 261 S.W.3d 734, 742 (Tenn. Ct. App. 2007)). Thus, we presume that the trial court's findings are correct unless the evidence preponderates against them. *Id.*; *see* Tenn. R. App. P. 13(d). For evidence to preponderate against a trial court's finding, it must support another finding with greater convincing effect. *Watson v. Watson*, 196 S.W.3d 695, 701 (Tenn. Ct. App. 2005) (citing *Walker v. Sidney Gilreath & Assocs.*, 40 S.W.3d 66, 71 (Tenn. Ct. App.

---

[7] It is significant to note that Father's petition did not include a prayer for modification of child support. Thus, Mother's petition was the only petition seeking modification of child support.

[8] Mother did not appeal the trial court's finding that modification of the residential schedule was in the Child's best interest.

2000); *Realty Shop, Inc. v. RR Westminster Holding, Inc.*, 7 S.W.3d 581, 596 (Tenn. Ct. App. 1999)).

When considering a petition to modify a residential schedule, a court must first determine whether the petitioner proved "a material change of circumstance affecting the child's best interest." Tenn. Code Ann. § 36-6-101(a)(2)(C); *see Armbrister*, 414 S.W.3d at 697. Section 36-6-101(a)(2)(C) "provides the governing standard for determining whether a material change in circumstances has occurred." *Armbrister*, 414 S.W.3d at 704. This standard is "a very low threshold" for petitioners to pass. *Id.* (quoting *Boyer v. Heimermann*, 238 S.W.3d 249, 257 (Tenn. Ct. App. 2007)). Two factors are relevant: (1) "whether a change has occurred after the entry of the order sought to be modified"; and (2) "whether a change is one that affects the child's well-being in a meaningful way." *Drucker v. Daley*, No. M2019-01264-COA-R3-JV, 2020 WL 6946621, at *7 (Tenn. Ct. App. Nov. 25, 2020) (citations omitted).

Among the changes identified in § 36-6-101 is "significant changes in the parent's **living** . . . **condition that significantly affect parenting**." Tenn. Code Ann. § 36-6-101(a)(2)(C) (emphasis added). Thus,

> for purposes of modifying a residential parenting schedule, a petitioner can establish that a material change of circumstances affects the child's well-being in a meaningful way through evidence of **changes to the petitioner's circumstances . . . that will allow more parenting time and/or a better parent-child relationship in the future**.

*Drucker*, 2020 WL 6946621, at *9 (emphasis added). Additionally, "evidence that an existing custody arrangement was proven unworkable in a significant way is sufficient to satisfy the 'material change in circumstances' standard." *Boyer*, 238 S.W.3d at 257 (citation omitted).

Mother contends that she never "terminated" Father's visitation because Father never asked her for visitation. This argument misses the forest for the trees. The separation agreement gave Father visitation "as agreed upon by the parties to be supervised at all time by [Grandparents]." Thus, Mother's refusal to allow Grandparents to see the Child was a de facto suspension of Father's visitation. Along the same line, Mother argues that her refusal to allow Grandparents to see the Child was not a material change because Father had not been exercising his right to visitation. But the evidence shows otherwise. Although Mother and Father may not have expressly "agreed upon" a visitation schedule, Father had been visiting the Child for years under the supervision of Grandparents.

Moreover, while Mother may not have known the full extent of Father's interactions with the Child, she knew that Father was seeing the Child under the supervision of Grandparents. Thus, Mother's refusal to allow Grandparents to see the Child demonstrated that the "existing arrangement" was unworkable. *See Gentile v. Gentile*, No. M2014-

01356-COA-R3-CV, 2015 WL 8482047, at \*5 (Tenn. Ct. App. Dec. 9, 2015) (citing *Rose v. Lashlee*, No. M2005-00361-COA-R3-CV, 2006 WL 2390980, at \*2 n.3 (Tenn. Ct. App. Aug. 18, 2006)).

Even if Mother's actions did not constitute a material change in circumstance, we would affirm the trial court's decision on other grounds. The record is replete with evidence that Father made great strides in his mental health since the divorce.[9] This alone constitutes "a material change of circumstances [that] affects the child's well-being in a meaningful way" because it is "evidence of changes to the petitioner's circumstances . . . that will allow more parenting time and/or a better parent-child relationship in the future." *Drucker*, 2020 WL 6946621, at \*9 (citing *Armbrister*, 414 S.W.3d at 705).

For these reasons, we agree with the trial court's finding that a material change in circumstance occurred.

### III. CHILD SUPPORT CALCULATION

Mother next contends that the trial court incorrectly calculated the parties' gross incomes because the court "imputed" income to Mother but not Father.

### A. Father's Gross Income

In its written order, the trial court found that "Father is currently making $1,692.80 per month." Mother does not dispute this finding, but she contends that the trial court should have found Father willfully underemployed and imputed additional income to him because he "voluntarily" quit two jobs and worked only 20 hours a week.[10]

A court may impute additional income to reflect "the parent's income potential or earning capacity," but only if the court first determines that a parent is "willfully underemployed or unemployed." Tenn. Comp. R. & Regs. 1240-02-04-.04(3)(a)(2)(i),

---

[9] Inexplicably, Mother contends in her appellate reply brief that "[t]here is no evidence Father has rehabilitated himself from his schizoaffective disorder, auditory hallucinations/obsessive thoughts, obsessive compulsive disorder or severe anxiety" and that "[t]he record is devoid of any evidence that Father . . . has made any progress in addressing his schizo affective disorder and able to care for himself or the minor child." These claims are incredible given the trial court's multiple findings that Father has made great strides in his treatment—findings which are fully supported by the testimony of not one but three expert witnesses who had treated Father for years.

[10] Father argues that Mother has raised this issue for the first time on appeal. On the contrary, Mother alleged that Father was willfully underemployed in her pretrial brief and at trial. *See Childs v. Roane Cnty. Bd. of Educ.*, 929 S.W.2d 364, 366 (Tenn. Ct. App. 1996) ("Trial of an issue by implied consent will be found when a party opposed to the motion knew or should reasonably have known of the evidence relating to the new issue, did not object to this evidence, and was not prejudiced thereby." (citing *Zack Cheek Builders, Inc. v. McLeod*, 597 S.W.2d 888 (Tenn. 1980))).

(i)(I), (ii)(II). "[T]he party alleging that a parent is willfully or voluntarily underemployed or unemployed carries the burden of proof." *Cain-Swope v. Swope*, 523 S.W.3d 79, 91 (Tenn. Ct. App. 2016) (citing *Brewer v. Brewer*, No. M2005-02844-COA-R3-CV, 2007 WL 3005346, at *8 (Tenn. Ct. App. Oct. 15, 2007); *Richardson v. Spanos*, 189 S.W.3d 720, 727 (Tenn. Ct. App. 2005)). "Determining whether a parent is willfully and voluntarily underemployed or unemployed are questions of fact that require careful considerations of all the attendant circumstances." *Id.* (citing *Richardson*, 189 S.W.3d at 726). Courts "must consider a parent's past and present employment, education, training, ability to work, and any other relevant facts." *Id.* (citing Tenn. Comp. R. & Regs. 1240-02-04-.04(3)(a)(2)(iii)).

According to his testimony, Father had a sparse employment history: He worked in technical support "a while back"; he was unemployed in 2018; he worked as a dishwasher for a few days in 2019; and he worked as a delivery driver for a month in 2020. Father explained that he was unemployed in 2018 because he was disabled and in school part-time, and he quit his other jobs because they were "stressful" and he had "bad anxiety."

Father also presented a summary of his SSDI benefits, showing annual earnings for 2006 through 2019. Since Father's discharge from the military in 2012, the most Father earned in a single year was $4,323.75 in 2013. From 2014 to 2019, Father's total earnings were just $2,328.96. These figures were corroborated in part by Father's 2018 and 2019 tax returns.

According to his sworn income and expense statement, Father earned $572 per month as of November 2020. Father testified that he worked part-time at a bookstore earning $8.25 an hour. Father also testified that he wanted to work more, but he had asked his employer to increase his hours gradually.

The trial court did not make a finding on whether Father was willfully unemployed or underemployed, but the court's ruling from the bench reveals that it would not have set Father's income any higher if it had. At the end of the final hearing on January 21, 2021, the trial court explained that it was adopting the $1,692.80 figure because that number was "higher" than what the court otherwise would have imputed to Father:

> And as to child support, I find [Father] testified that he makes 8.25 an hour and [works] 20-hour weeks. That comes out to $715 a month. I was going to impute him double that, but based on his parenting plan, it says he makes $1,692.80 a month. That's higher than what I was going to impute him. So that's what I find that he makes.

Tennessee Rule of Appellate Procedure 36(b) provides that "[a] final judgment from which relief is available and otherwise appropriate shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process." Based on the above, we find

- 13 -

any error by the trial court was not prejudicial to Mother because the court ultimately set Father's income higher than it would have if Father had been willfully underemployed.[11]

## B. Mother's Gross Income

Mother argues that the court improperly "imputed" earnings to her by using her income for 2017 and 2018 to calculate her gross income for 2021. We disagree.

"For the purpose of setting child support, a noncustodial parent's net income is generally established by introducing pay stubs, personal tax returns, or other credible records evidencing income." *State ex rel. Vaughn v. Kaatrude*, 21 S.W.3d 244, 249 (Tenn. Ct. App. 2000) (citing *Kirchner v. Pritchett*, No. 01A01-9503-JV-00092, 1995 WL 714279, at *2 (Tenn. Ct. App. Dec. 6, 1995)); *see* Tenn. Comp. R. & Regs. 1240-2-4-.04(3)(a)(2)(iv)(I). The parent seeking to modify a child support obligation has the burden of proof. *See Wine v. Wine*, 245 S.W.3d 389, 394 (Tenn. Ct. App. 2007) (citing *Turner v. Turner*, 919 S.W.2d 340, 345 (Tenn. Ct. App. 1995)).

Father elicited the only evidence of Mother's income during cross-examination when Mother confirmed that $52,843 and $52,230 "sound[ed] right" for what she earned during 2017 and 2018. At the end of Mother's proof, the trial court specifically asked Mother's counsel if she had any other evidence of Mother's income:

> THE COURT: Okay. Any other proof, Ms. Baker?
>
> MS. BAKER: No.
>
> THE COURT: You know, according to my recollection, I'm very scant on proof as far as child support figures. All I got that I can base it on is testimony on 2017 and '18 income for [Mother], and I know nothing about other in-home children or payment of child support to somebody else that might affect child support. . . . So that's all the proof that the Court has to go on.

---

[11] Mother argues that the child support guidelines require courts to impute a median gross income of $43,761 per year to parents who are willfully underemployed. This is incorrect. The guidelines direct courts to use the median gross income when there is **no** reliable evidence of a parent's income. *See* Tenn. Comp. R. & Regs. 1240-02-04-.04(3)(a)(2)(iv). But "a trial court may not impute the median gross income when reliable evidence of a parent's income or income potential has been presented." *In re Samuel P.*, No. W2016-01665-COA-R3-JV, 2018 WL 1046784, at *13 (Tenn. Ct. App. Feb. 23, 2018) (citations omitted).

In response, Mother's counsel simply pointed out that Mother "testified [that] she has two other children."

Based on this evidence, the trial court found that Mother had a gross monthly income of $4,333.33 per month. Thus, contrary to Mother's argument, the trial court did not "impute" income to Mother. Instead, it made a finding based on the only evidence presented at trial.[12] Accordingly, we find the court did not err in its calculation of Mother's gross income.

## IV. PRE- AND POSTJUDGMENT INTEREST

Mother contends that the trial court erred by denying her request for awards of pre- and postjudgment interest. She asserts that the trial court should have applied Kentucky Revised Statutes § 360.040(2), which provides that "[a] judgment for unpaid child support payments shall bear twelve percent (12%) interest compounded annually from the date the judgment is entered." Father does not dispute whether Mother was entitled to interest, but he argues that Tennessee law applies to payments due under the new support order.

When enforcing a child support order, courts must apply the law of the "issuing state" to compute arrearages and accrual of interest. Tenn. Code Ann. § 36-5-2604(a), (d). Thus, Kentucky law applies to the accrual of interest on payments due under the Kentucky order, and Tennessee law applies to the accrual of interest on payments due under the Tennessee order.

### A. Payments Due Under Kentucky Order

In Kentucky, child support obligees are "entitled to prejudgment interest as a matter of law from the date that each payment was due." *Pursley v. Pursley*, 144 S.W.3d 820, 828–29 (Ky. 2004). "Prejudgment interest is limited to the legal rate, found in KRS 360.010, of 8%." *Fields v. Fields*, 58 S.W.3d 464, 467 (Ky. 2001) (citations omitted); *see Pursley*, 144 S.W.3d at 828 (awarding 8% prejudgment interest on unpaid child support). Accordingly, we find Mother was entitled to an award of prejudgment interest at the rate of 8% on unpaid support due under the Kentucky order, running from the date that each payment was due until the entry of the arrearage judgment in 2021.

---

[12] On appeal, Mother cites to her pretrial witness and exhibit list as proof that she "presented reliable evidence" of her income to the trial court. Mother's pretrial filing, however, only identifies her tax and income documents as *potential* exhibits. None of those documents were entered into evidence or included in the record. Regardless, this court may consider only "those facts established by the evidence in the trial court and set forth in the record and any additional facts that may be judicially noticed or are considered pursuant to [Tennessee Rule of Appellate Procedure] 14." Tenn. R. App. P. 13(c).

Additionally, under Kentucky Revised Statutes Annotated § 360.040(2), "[a] judgment for unpaid child support payments **shall** bear twelve percent (12%) interest compounded annually from the date the judgment is entered." Ky. Rev. Stat. Ann. § 360.040 (emphasis added). This language is mandatory. *See Doyle v. Doyle*, 549 S.W.3d 450, 456 (Ky. 2018). Thus, Mother is also entitled to postjudgment interest at the rate of 12% on the arrearage, compounded annually and running from the entry of the judgment in 2021.[13]

For these reasons, we reverse the trial court's denial of Mother's request for pre- and postjudgment interest on payments due under the Kentucky support order. Because we have modified the effective date of the Tennessee support order, Mother is entitled to pre- and postjudgment interest on the payments due from January 2014 through December 2020.

## B. Payments Due Under Tennessee Order

In Tennessee, prejudgment interest on unpaid child support is governed by Tennessee Code Annotated § 36-5-101. *See Reeder v. Reeder*, 375 S.W.3d 268, 281 (Tenn. Ct. App. 2012). Postjudgment interest is governed by Tennessee Code Annotated § 47-14-122. *See Tallent v. Cates*, 45 S.W.3d 556, 563 (Tenn. Ct. App. 2000).[14]

Section 47-14-122 provides, "Interest shall be computed on every judgment from the day on which the jury or the court, sitting without a jury, returned the verdict without regard to a motion for a new trial." Tenn. Code Ann. § 47-14-122. Because we have modified the effective date of Father's new support obligation to December 2020, this statute applies only to the arrearage accrued in January 2021. Pursuant to § 47-14-122, Mother was entitled to an award of postjudgment interest on this portion of the judgment.[15]

Tennessee Code Annotated § 36-5-101 provides that the award of pre-judgment interest is within the discretion of the trial court for payments due after April 12, 2017:

---

[13] The Supreme Court of Kentucky has interpreted Kentucky Revised Statutes Annotated § 360.040 as requiring "accrual of postjudgment interest from the date of the pre-appeal, erroneous judgment" when the record is not required to be reopened on remand. *Commonwealth, Just. & Pub. Safety Cabinet, Dep't of Kentucky State Police v. Gaither*, 539 S.W.3d 667, 674 (Ky. 2018).

[14] *But see Sandusky v. Sandusky*, No. M2000-00288-COA-R3-CV, 2001 WL 327898, at *8 (Tenn. Ct. App. Apr. 5, 2001) (stating that Tennessee Code Annotated § 36-5-101 is the statute that "specifically govern[s] postjudgment interest on a child support arrearage").

[15] The postjudgment interest rate is set by Tennessee Code Annotated § 47-14-121. In matters tried without a jury, postjudgment interest begins to run from the date that the court makes its findings of fact and conclusions of law. *See Davis v. Davis*, 924 S.W.2d 351, 353 (Tenn. 1996).

(B)(i)     Interest on unpaid child support that is in arrears shall accrue from the date of the arrearage at the rate of twelve percent (12%) per year; provided, that interest shall no longer accrue on or after April 17, 2017, unless the court makes a written finding that interest shall continue to accrue. In making such finding, the court shall set the rate at which interest shall accrue after consideration of any factors the court deems relevant; provided, that the interest rate shall be no more than four percent (4%) per year.

(ii)     On or after July 1, 2018, interest on arrearages in non-Title IV-D cases shall accrue at the rate of six percent (6%) per year; provided, however, that the court, in its discretion, may reduce the rate of interest to a lower interest rate, including no interest, as deemed appropriate under the circumstances. In making its determination, the court may consider any factors the court deems relevant.

*Id.* § 36-5-101(f)(1).[16]

Because the Tennessee order was not effective until December 2020, the trial court had discretion over whether to award prejudgment interest on payments due thereafter. The court declined to award interest because Mother's "own actions . . . caused a lengthy delay to the conclusion of the[] proceedings." This decision was well within the trial court's discretion, and Mother has provided no reason for us to disagree.

For these reasons, we affirm the trial court's denial of Mother's request for an award of prejudgment interest and reverse its denial of postjudgment interest on the arrearage accrued under the Tennessee support order.[17]

---

[16] Before 2017, Tennessee Code Annotated § 36-5-101 mandated the award of prejudgment interest on unpaid child support. *See Reeder*, 375 S.W.3d at 281. The Tennessee General Assembly amended the statute to its current version in 2017 and 2018. *See* Act of April 17, 2017, 2017 Tenn. Pub. Acts ch. 145, § 1; Act of May 21, 2018, 2018 Tenn. Pub. Acts, ch. 1049, § 2.

[17] Because our holding will change the amount of Father's arrearage, it may be necessary for the trial court to reconsider its order for Father to pay the judgment in $100 installments. *See Tallent*, 45 S.W.3d at 563 (finding installment plan was unreasonable when the "court[-]ordered payments . . . of $200 monthly, with postjudgment interest accruing at 10% annually, would not cover even the interest, let alone pay down the judgment").

## V. APPELLATE ATTORNEY'S FEES

Mother contends that she is entitled to an award of her appellate attorney's fees under Tennessee Code Annotated § 36-5-103(c) and the fee-shifting provision in the parties' 2012 settlement agreement.

"[W]hen confronted with a request for fees under both contractual and statutory authority, our courts should look to the parties' contract first before moving on to any discretionary analysis under statutes such as section 36-5-103(c) and section 27-1-122." *Eberbach v. Eberbach*, 535 S.W.3d 467, 478 (Tenn. 2017). Thus, we will first address Mother's request for an award of fees under the settlement agreement.

### A. Settlement Agreement

Reviewing requests for fees under a contract involves a three-step process:

> Courts . . . should first determine whether the parties have a valid and enforceable [agreement] that governs the award of attorney's fees for the proceeding at bar. If so, our courts must look to the actual text of the provision and determine whether the provision is mandatory and applicable. If so, the [agreement] governs the award of fees, and our courts must enforce the parties' contract.

*Id.* at 478–79.

The parties' separation agreement provided:

> 12. <u>Post-Dissolution Attorneys' Fees</u>. In the event either party violates or fails to abide by any provision of this Agreement, then the party in violation shall pay to and reimburse the other party for all attorney's fees, court costs and expenses incurred by the party not in violation as a result in having to enforce this Agreement and the final decree entered pursuant hereto.

Contrary to Mother's contentions, we find two reasons why she is not entitled to recover attorney's fees pursuant to the foregoing. For one, Father was not required to pay child support under the separation agreement. Stated another way, the agreement contains no child support provision to be enforced. Instead, Mother merely reserved the right to seek support in the future:

> 5. <u>Child Support</u>. Since [Father] currently is unemployed and is undergoing treatment at Vanderbilt, he shall have no child support obligation to [Mother] for [the Child] at the present time. The parties acknowledge that [Mother] may seek child support from [Father] at a later date in accordance with KRS 403.210 and 403.211.

- 18 -

The other reason is that Mother did not bring an action to enforce the separation agreement or the final decree. Instead, Mother brought an action to enforce and modify the 2013 Kentucky support order and to enforce the resulting Tennessee support order. Neither order referenced the separation agreement nor provided for the allocation of attorney's fees and costs to the nonprevailing party.

For these reasons, we deny Mother's request for an award of her appellate attorney's fees under the 2012 separation agreement.

### B. Tennessee Code Annotated § 36-5-103(c)

Tennessee Code Annotated § 36-5-103(c) allows for the award of attorney's fees to the prevailing party in proceedings to enforce or modify a permanent parenting plan:

> A prevailing party may recover reasonable attorney's fees, which may be fixed and allowed in the court's discretion, from the nonprevailing party in any . . . action or other proceeding to enforce, alter, change, or modify any decree of . . . child support, or provision of a permanent parenting plan order, or in any suit or action concerning the adjudication of the custody or change of custody of any children, both upon the original divorce hearing and at any subsequent hearing.

Tenn. Code Ann. § 36-5-103(c). When considering a request for appellate attorney's fees under § 36-5-103, we consider three nonexclusive factors: (1) "the ability of the requesting party to pay his or her own attorney's fees"; (2) "the requesting party's success on appeal"; and (3) "whether the requesting party has been acting in good faith." *Shofner v. Shofner*, 181 S.W.3d 703, 719 (Tenn. Ct. App. 2004) (citing *Parchman v. Parchman*, No. W2003-01204-COA-R3-CV, 2004 WL 2609198, at *6 (Tenn. Ct. App. Nov. 17, 2004)).

After considering all relevant factors, we respectfully deny Mother's request for an award of her appellate attorney's fees under Tennessee Code Annotated § 36-5-103(c).

### IN CONCLUSION

We modify the effective date of Father's Tennessee child support obligation and reverse in part and affirm in part the trial court's denial of Mother's request for pre- and postjudgment interest. We affirm the trial court's judgment in all other respects. This matter is remanded for the trial court to recalculate Father's arrearage and award pre- and postjudgment interest consistent with this opinion. Costs of appeal assessed against Elizabeth Ann Baker Grace.

_____
FRANK G. CLEMENT JR., P.J., M.S.

- 19 -